# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRYANA BIBLE individually and on behalf of the proposed class, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:13-cv-00575-TWP-TAB |
| UNITED STUDENT AID FUNDS, INC., | ) ) ) | |
| Defendant. | ) | |

## ENTRY ON MOTION TO STRIKE AND MOTION TO DISMISS

This matter is before the Court on a Motion to Strike (Dkt. 45) and Motion to Dismiss (Dkt. 47) filed by Defendant United Student Aid Funds, Inc. ("USA Funds"). Plaintiff Bryana Bible ("Ms. Bible") purports to represent a class of borrowers who obtained student loan funds through the Federal Family Education Loan Program ("FFELP") and whose loans were guaranteed by USA Funds. Ms. Bible asserts a breach of contract claim and alleges that USA Funds violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by charging collection costs on her defaulted loan and applying her payments to these collection costs. Oral argument was held on the motions on February 12, 2014, and the Court took the matter under advisement. Having considered the parties' arguments and briefs, the Court now **DENIES** the Motion to Strike (Dkt. 45) and **GRANTS** the Motion to Dismiss (Dkt. 47).

### I. BACKGROUND

USA Funds is a guarantee agency for student loans. Among other things, it guarantees student loans under the Higher Education Act's ("HEA") Federal Family Education Loan Program ("FFELP"). Under FFELP, private lenders make loans to students attending post-secondary institutions, which are guaranteed by agencies such as USA Funds. If a borrower

defaults on the loan, the loan is transferred to the guarantee agency which pays the private lender for the debt and then itself seeks payment from the borrower.

Ms. Bible obtained an FFELP student loan in 2006. Citibank was the private lender and USA Funds is the guarantor of Ms. Bible's loan. Ms. Bible electronically signed a Federal Stafford Loan Master Promissory Note ("MPN") on June 12, 2006, which covers all of her student loans. Dkt. 38-3. The MPN explicitly provides that Ms. Bible

> . . . promise[s] to pay all loan amounts disbursed under the terms of the MPN, plus interest and other charges and fees that may become due as provided in this MPN. . . . If I do not make any payment on the loan made under this MPN when it is due, *I will also pay reasonable collection costs*, including but not limited to attorney's fees, court costs, and other fees.

Dkt. 38-3 at 2, ¶ 15 (emphasis added). The MPN further provides that in the event Ms. Bible defaulted on the loan, the lender could accelerate her loan such that the entire unpaid balance would become immediately due and payable; the guarantor would then be able to purchase the loan and capitalize all then-outstanding interest into a new principal balance, and collection fees would become due and payable. Dkt. 38-3 at 3. Under the "Repayment" paragraph of the MPN, the agreement states that payments on the loan may be applied in the following order: late charges, fees, and collection costs first, outstanding interest second and outstanding principal last. Dkt. 38-3 at 6. Under the "Consequences of Default" section, the MPN states that failure to repay the loan under the MPN may result in collection charges (including attorney fees) being assessed. Dkt. 38-3 at 7-8.

In 2012, Citibank found Ms. Bible in default, a fact which she does not dispute. Thereafter, the loan was assigned, purchased, or otherwise transferred to USA Funds, and USA Funds paid Citibank's default claim for the loan. After default, Ms. Bible's loan was placed with General Revenue Corporation ("GRC") for collection. GRC subsequently offered Ms. Bible the

opportunity to rehabilitate her defaulted loan, which would remove it from default status after certain conditions were met. GRC sent a letter to Ms. Bible dated April 12, 2012, which explained the loan rehabilitation program and included a notice entitled "Options for Resolving Your Loan Debt." Dkt. 38-4 at 4. Under the program, Ms. Bible had the opportunity to resolve her loan default by entering into a Loan Rehabilitation Program whereby if she made nine on time payments within ten months, the rehabilitation commitment would be complete and her defaulted student loan would be eligible for purchase by a lender. Once the rehabilitated loan is purchased by a new lender, the loans would no longer be considered in default and the default status would be removed from her credit record. The letter also stated, "As part of your eligibility for loan rehabilitation, you will be assessed collection costs at a reduced rate of 18.5% of the outstanding balance at the time your loan is purchased by an eligible lender, and the purchasing lender may add these costs to your outstanding loan principal. . . ." *Id.*

On or about April 27, 2012, GRC sent Ms. Bible a rehabilitation program application packet which informed her that her current collection cost balance as of that date was $0.00. Dkt. 38-5 at 3. The GRC letter also stated that this was the amount owed "[a]s of the date of this letter" and "[b]ecause your credit agreement may require you to pay interest on the outstanding portion of your balance, as well as late charges *and costs of recovery* . . . the amount required to pay your account in full on the day you send payment may be greater than the amount stated here." Dkt. 38-5 at 1 (emphasis added). The Capitalization Authorization Letter provided by GRC in the rehabilitation application packet stated, "Once rehabilitation is complete, *the collection costs that have been added* will be reduced to 18.5% of the unpaid principal and accrued interest outstanding at the time of Loan Rehabilitation. *Collection costs* may be capitalized at the time the Loan Rehabilitation by your new lender. . . ." Dkt. 38-5 at 5

(emphasis added). Ms. Bible agreed to make ten payments of $50.00 per month in order to rehabilitate her loan. USA Funds subsequently imposed collection costs in the amount of $4,547.44.

Despite multiple references to the imposition of collection costs in both the MPN and the Rehabilitation Agreement, Ms. Bible now claims that USA Funds unlawfully imposed collection costs on her, arguing that neither the MPN nor the Rehabilitation Agreement authorized the imposition of collection costs. Ms. Bible asserts that the HEA does not authorize the imposition of collection costs in situations like hers where a borrower in default promptly enters into a Rehabilitation Agreement, and because the original student loan agreement (*i.e.* the MPN) is governed by the HEA, the collection terms in the MPN do not apply. Essentially she argues that the HEA does not authorize the imposition of collection costs on borrowers who default on their loans once they enter into a Rehabilitation Agreement, and because the MPN incorporates the HEA by reference, USA Funds acted unlawfully by imposing collection costs on her. She also argues that USA Funds breached the contract because the original rehabilitation application sent to her on April 27, 2012 stated that her current collection cost balance was $0.00, and she argues USA Funds was not authorized to increase this amount, only decrease the amount.

Furthermore, Ms. Bible's First Amended Complaint (Dkt. 38) also asserts a claim under RICO. Ms. Bible asserts that USA Funds, GRC, and Sallie Mae collaborated to fraudulently represent to her that her collection costs were $0.00 in order to induce her to sign the Rehabilitation Agreement, knowing that USA Funds would subsequently impose unlawful collection costs on her. Ms. Bible also alleges that they then illegally applied her payments to collection costs, instead of to the interest and principal that she owed. Ms. Bible purports to

represent a class of approximately 100,000 student loan borrowers who have defaulted on their loans, entered into Rehabilitation Agreements, and were subsequently charged collection costs.

## II. LEGAL STANDARD

When reviewing a 12(b)(6) motion, the court takes all well-pleaded allegations in the complaint as true and draws all inferences in favor of the plaintiff. *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008) (citations omitted). However, the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citations omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citation omitted). When ruling on a motion to dismiss, a court generally should only consider the complaint's allegations. *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005) (citation omitted). However, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c).

## III. DISCUSSION

**A. Motion to Strike**

USA Funds filed a Motion to Strike paragraphs 95-107 and Exhibits 7 and 8 of Ms. Bible's First Amended Complaint under Federal Rule of Civil Procedure 12(f) (Dkt. 45). Rule 12(f) of the Federal Rules of Civil Procedure provides that "the court may strike from a pleading

an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are disfavored because they potentially only serve to delay. *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

USA Funds asserts that the information contained in paragraphs 95-102 and Exhibits 7 and 8 was improperly disclosed in another case for which the sanction was dismissal of the lawsuit. The previous lawsuit was filed in 2008 in the Northern District of Illinois and did not involve Ms. Bible. Exhibit 7 consists of a copy of a June 26, 2008 online article from the *Chronicle of Higher Education*, entitled "Contract Raises New Concerns over Sallie Mae's Ties to Guarantor." Dkt. 38-8. The article is based on a "Guarantee Services Agreement" between USA Funds and Sallie Mae, Inc. which the author of the article claims was leaked to the website Wikileaks. Exhibit 8 is a copy of the "Guaranty Services Agreement" referenced in the article. Ms. Bible obtained Exhibits 7 and 8 from the internet and references the Guaranty Services Agreement's storage on the Wikileaks website in her First Amended Complaint. Dkt. 38 at 19. Paragraphs 95-102 of Ms. Bible's First Amended Complaint are based on the information contained in Exhibits 7 and 8.

In the course of discovery in the prior lawsuit, USA Funds produced documents, including the Guarantee Services Agreement, to opposing counsels pursuant to counsels' agreement that such production would be for "attorneys' eyes only" until the protective order covering the original defendant could be modified to include all defendants, including USA Funds. Despite the verbal agreement, plaintiff's counsel provided the agreement to his client, another attorney and a reporter at the *Chronicle of Higher Learning*. On June 24, 2008, USA Funds learned that a copy of the confidential document had been posted on Wikileaks. The district court in that case granted USA Funds' motion to dismiss the case as a sanction for this

6

and a number of other violations of professional conduct by plaintiff's counsel, and the Seventh Circuit upheld the dismissal. *See Salmeron v. Enterprise Recovery Sys., Inc.*, 579 F.3d 787 (7th Cir. 2009).

USA Funds now argues that this material should be stricken from Ms. Bible's First Amended Complaint under Rule 12(f) because it is "immaterial, impertinent, or scandalous," has no material relation to or bearing on the subject matter of the litigation, and will prejudice USA Funds. USA Funds also argues that Ms. Bible should not be permitted to benefit from sanctionable conduct. In contrast, Ms. Bible argues that she lawfully obtained the information that has been publically available online for the past five years. Both parties cite to *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 428 (E.D.N.Y 2007) in support of their arguments. In *Zyprexa*, the district court reviewed whether non-parties could be enjoined from further disseminating information that was improperly released by a party's expert witness and a reporter. The leaked documents, which were subject to a protective order, were widely disseminated to various organizations and individuals, and excerpts were published in an article in *The New York Times*. The court issued an injunction requiring the recipients of the leaked documents to return them, and against the conspirators who distributed the documents to these individuals. However, the court confined the injunction to only these individuals, finding it was doubtful that an injunction could be enforced against the "constantly expanding universe" of people who would have access to the documents online as a result of the original breach of the protective order. *Id.* at 379.

USA Funds compares Ms. Bible to the individuals who initially received the documents from the expert who violated the protective order in *Zyprexa*; however, the Court finds that Ms. Bible is more akin to the individuals in the "constantly expanding universe," as characterized by

the *Zyprexa* court. Ms. Bible obtained these documents from publically available online sources, not from the parties in the *Salmeron* case. The documents have been available in the public domain for more than five years, and this Court does not have the power or ability to limit its access. *See Zyprexa*, 474 F. Supp. 2d at 428 ("[I]t is unlikely that the court can now effectively enforce an injunction against the internet in its various manifestations, and it would constitute a dubious manifestation of public policy were it to attempt to do so."). Ms. Bible's complaint does not put this material "in the public eye" any more than the internet has already done so. In addition, the dismissal sanction in *Salmeron* was not only for the improper disclosure of confidential documents, but was also for a host of other professional conduct violations, so the sanction of dismissal for the disclosure carries less weight than it would had the disclosure been the only violation.

Additionally, USA Funds has not shown that the paragraphs and exhibits at issue are immaterial, scandalous, impertinent, or prejudicial. Ms. Bible uses the materials in an attempt to support her RICO claim in order to show an enterprise and pattern of racketeering activity, so she has shown that they are relevant to her complaint. In addition, USA Funds' only argument that the materials are "scandalous" or "impertinent" is based upon the improper disclosure in a previous lawsuit, which, as discussed, does not support a motion to strike. Therefore, USA Funds' Motion to Strike (Dkt. 45) is **DENIED**.

**B.     Motion to Dismiss**

    **1.     Preemption under the HEA**

USA Funds asserts that Ms. Bible's claims should be dismissed because they are preempted by the HEA. USA Funds argues that Ms. Bible's breach of contract and RICO claims are essentially disguised as claims for violations of the HEA, and there is no private right of

action under the HEA. In response, Ms. Bible argues that she is bringing a state law claim for breach of contract, and that the requirements of the HEA are simply terms of the MPN incorporated by reference.

The Higher Education Act of 1965, now codified at 20 U.S.C. §§ 1001–1155, was passed "to keep the college door open to all students of ability, regardless of socioeconomic background." *Rowe v. Educ. Credit Mgmt. Corp.,* 559 F.3d 1028, 1030 (9th Cir. 2009) (internal quotation marks omitted). As part of that effort, Congress established the FFELP as a system of loan guarantees meant to encourage private lenders to loan money to students and their parents on favorable terms. *See* 20 U.S.C. §§ 1071–1087–4; *Rowe,* 559 F.3d at 1030. The Secretary of the Department of Education is authorized to "prescribe such regulations as may be necessary to carry out the purposes" of the FFELP. 20 U.S.C. § 1082(a)(1). Under that authority, the Department of Education has promulgated detailed regulations. *See* 34 C.F.R. §§ 682.100–682.800. The private lenders must abide by the terms of the FFELP regulations, and may assign their loans to third-party loan servicers who must also abide by the regulations. *See* 20 U.S.C. § 1082(a)(1); 34 C.F.R. §§ 682.203, 682.700(a). When a borrower defaults on his or her student loan and the lender is unable to recover the amount despite due diligence, the lender recoups its loss from a guarantor. 34 C.F.R. § 682.101(e)(7). Guarantors must enter into agreements with the Department of Education in order to participate in the FFELP. 20 U.S.C. § 1078(c). When a lender assigns a guaranty agency a defaulted loan, the guaranty agency must take steps to recover the defaulted amount, but may recover up to one hundred percent of its losses from the Department of Education if it is unable to collect the debt. 34 C.F.R. §§ 682.404(a), 682.410(b)(6).

The HEA does not provide for a private cause of action but, rather, "only provides for a suit brought by or against the Secretary of Education." 20 U.S.C. §1082(a)(2). "[T]he HEA provides administrative remedies, whereby the Secretary of Education can monitor and sanction Defendants' non-compliance with the statute." *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1226 (11th Cir. 2002); *see also* 20 U.S.C. §§ 1082(g) (authority to impose civil penalties upon lenders), 1082(h) (authority to impose sanctions) 1082(j) (authority to take emergency action against lenders).

Ms. Bible claims that she is not attempting to enforce the requirements of the HEA, but that is exactly what she is attempting to do by claiming that USA Funds acted contrary to the HEA by imposing collection costs. Merely rephrasing her suit as a breach of contract action does not salvage her claim. "[A borrower] cannot circumvent the statutory and regulatory scheme by calling his claim a breach of contract." *Gibbs v. SLM Corp.*, 336 F. Supp. 2d 1, 16 (D. Mass. 2004) *aff'd,* 05-1057, 2005 WL 5493113 (1st Cir. Aug. 23, 2005); *cf. McCulloch*, 298 F.3d at 1226-27 (plaintiffs were not permitted to circumvent the HEA's administrative remedies by "packaging" their HEA claim as a RICO claim). In order to decide the merits of Ms. Bible's claims, the Court would necessarily have to interpret and apply the HEA, not merely the language of the MPN. The Court declines Ms. Bible's invitation to deviate in view of the overwhelming number of courts that have addressed this issue and concluded that there is no express or implied private right of action under the HEA, thus such claims, even when recharacterized as breach of contract or RICO claims, fail to state a cause of action. *See, e.g., Parola v. Citibank (S. Dakota) N.A.*, 894 F. Supp 188, 196 (D. Conn. 2012); *McCulloch*, 298 F.3d at 1221; *Gibbs*, 336 F. Supp. at 14; *Labickas v. Ark. St. Univ.*, 78 F.3d 333, 334 (8th Cir. 1996); *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1485 (9th Cir. 1995); *L'ggrke v. Benkula*,

966 F.2d 1346, 1348 (10th Cir. 1992); *Bartels v. Alabama Comm. Col.*, 918 F.Supp. 1565, 1573 (S.D. Ga. 1995); *N.Y. Inst. of Dietetics, Inc. v. Great Lakes Higher Ed. Corp.*, No. 94-CIV-4858, 1995 WL 562189 (S.D.N.Y. Sept. 21, 1995), *Moy v. Adelphi Inst., Inc.*, 866 F.Supp. 696, 705 (E.D.N.Y.1994); *Hudson v. Acad. of Court Reporting*, 746 F.Supp. 718, 721 (S.D. Ohio 1990); *St. Mary of the Plains Col. v. Higher Ed. Loan Program of Kansas, Inc.*, 724 F. Supp. 803, 806–07 (D. Kan. 1989). Thus, the Court concludes that Ms. Bible's claims are preempted by the HEA and she has therefore failed to state a cause of action.

## 2. Breach of Contract

### a. The Master Promissory Note explicitly permits collection costs

Even if the Court were to find that the HEA does not preempt Ms. Bible's claims, they still fail under the plain language of the MPN. The MPN is attached to Ms. Bible's First Amended Complaint, so the Court may properly consider it in deciding this Motion to Dismiss. *See* Fed. R. Civ. P. 10(c); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("[D]istrict courts are free to consider any facts set forth in the complaint that undermine the plaintiff's claim . . . includ[ing] exhibits attached to the complaint[.]")

Ms. Bible electronically executed the MPN on June 12, 2006, and does not dispute that the MPN governs all of her loans obtained through the FFELP Program. Dkt. 38-3 at 2. The MPN states in at least six different places that collection costs would be imposed in the event of default and/or that payments would be allocated to collection costs prior to being allocated to principal and interest. *See* Dkt. 38-3 at 2 ("If I do not make any payment on any loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees."); Dkt. 38-3 at 3 ("If I default on any loans, I will pay reasonable collection fees and costs, plus court costs and attorney fees."); *Id.*

("Payments submitted by me or on my behalf . . . may be applied first to charges and collection costs that are due, then to accrued interest that has not been capitalized, and finally to the principal amount."); *Id.* ("If I default, the guarantor may purchase my loans and capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable."); Dkt. 38-3 at 6 ("All payments and prepayments may be applied in the following order: late charges, fees, and collection costs first, outstanding interest second, and outstanding principal last."); Dkt. 38-3 at 7 ("If I default, the entire unpaid balance and accrued collection fees on the applicable loans will become immediately due and payable.").

Ms. Bible focuses her argument on a single paragraph of the MPN entitled "Late Charges and Collection Costs," arguing that it states USA Funds may only impose "charges and fees that are permitted by the Act for the collection of my loans." Dkt. 38-3 at 3; Bible Brief Dkt. 52 at 11. She argues that this sentence renders the terms of the MPN unenforceable because the term of the HEA control. Importantly, Ms. Bible ignores the statement immediately following that language, which states, "If I default on my loans, I will pay reasonable collection fees and costs, plus court costs and attorney fees." Dkt. 38-3 at 3. Contrary to Ms. Bible's inexplicable argument, the MPN itself clearly includes provisions that allow for the imposition of collection costs in the event of default. She provides no support for her argument that the HEA renders all terms of the MPN void and unenforceable, and such an interpretation goes against the principle that the Court must accept an interpretation of the contract which harmonizes its provisions, as opposed to one which causes the provisions to be conflicting. *R. R. Donnelley & Sons, Co. v. Henry-Williams, Inc.*, 422 N.E.2d 353, 356 (Ind. Ct. App. 1981). Thus, the Court finds that a breach of contract claim based solely on the language of the MPN fails.

### b. The Rehabilitation Agreement permits collection costs

Ms. Bible's breach of contract claim also fails under the language of the Rehabilitation Agreement. Ms. Bible argues that USA Funds breached the terms of the Rehabilitation Agreement by imposing collection costs not authorized by the HEA (which, as discussed above, provides no private right of action) and by imposing collection costs after informing her that her collection costs were $0.00. As with the MPN, the documents included with the Rehabilitation Agreement clearly state that collection costs would be imposed.

In the initial letter sent to Ms. Bible on April 12, 2012, which was the notice required to be sent by USA Funds within forty-five days of paying Citibank's default claim under 34 C.F.R. § 682.410(b)(5)(ii)(D), GRC, on behalf of USA Funds, informed Ms. Bible that her *current* collection balance was $0.00, but also stated,

> Because your credit agreement may require you to pay interest on the outstanding portion of your balance, as well as late charges *and costs of recovery*, which vary from day to day, as you agreed in your credit agreement, the amount required to pay your account in full on the day you send payment *may be greater than the amount stated here*.

Dkt. 38-4 at 3 (emphasis added). In addition, the page entitled "Options for Resolving Your Loan Debt" states, "As part of your eligibility for loan rehabilitation, *you will be assessed collection costs* at a reduced rate of 18.5% of the outstanding balance at the time your loan is purchased by an eligible lender. . . ." Dkt. 38-4 at 4 (emphasis added). The notice also stated that these collection costs would be assessed on her account sixty days after the default claim purchase. Dkt. 38-4 at 4. Thus, prior to entering into the Rehabilitation Agreement, Ms. Bible was clearly informed that if she entered into the loan rehabilitation program, the amount she owed would increase and would include collection costs.

On April 27, 2012, GRC sent a rehabilitation application to Ms. Bible outlining the requirements of the rehabilitation program for rehabilitating her loans and removing them from default status. The application included a cover letter, an Automated Withdrawal Authorization, and a Capitalization Authorization Letter. The cover page of the correspondence again stated,

> Because your credit agreement may require you to pay interest on the outstanding portion of your balance, as well as late charges *and costs of recovery*, which vary from day to day, as you agreed in your credit agreement, the amount required to pay your account in full on the day you send payment *may be greater than the amount stated here*.

Dkt. 38-5 at 2 (emphasis added). The Capitalization Authorization Letter stated that Ms. Bible's loans would only be rehabilitated "after purchase by an eligible lender" and that "[c]ollection costs may be capitalized at the time of the Loan Rehabilitation by your new lender, along with outstanding accrued interest, to form one new principal amount." Dkt. 38-5 at 5. As long as Ms. Bible's loans were in default status, she would be assessed collection costs. The only way to avoid collection costs was for Ms. Bible's loans to no longer be in a state of default; this would not occur until after she had satisfied all of the requirements of the rehabilitation program. *See* 34 C.F.R. § 682.405 ("A loan is considered to be rehabilitated only after [t]he borrower has made and the guaranty agency has received nine of the ten payments required under a monthly repayment agreement [and] [t]he loan has been sold to an eligible lender."). The Capitalization Authorization Letter also states that once rehabilitation is complete (*i.e.* the loan has been purchased by an eligible lender) "collection costs that have been added will be reduced to 18.5% of the unpaid principal and accrued interest outstanding at the time of the Loan Rehabilitation." *Id.* Finally, the Capitalization Authorization Letter states directly above the signature block, "By signing below, I understand and agree that the lender may capitalize collection costs of 18.5% of the outstanding principal and accrued interest upon rehabilitation of my loan(s)." *Id.* This

14

language clearly informed Ms. Bible that she would be assessed collection costs during the loan rehabilitation program.[1] The plain language of the documents conflicts with Ms. Bible's theory of recovery, thus she has failed to state a claim for relief.

      c.     **The HEA permits collection costs**

Additionally, the HEA itself does not prohibit the assessment of collection costs as argued by Ms. Bible. As stated previously, Ms. Bible's argument is that by stating that the lender may collect charges and fees permitted by the Act for the collection of her loans, the MPN only permits USA Funds to impose collection costs authorized by the HEA. She argues that the HEA gives borrowers sixty days to enter into a rehabilitation agreement and avoid collection costs, citing 34 C.F.R. §§ 682.410(b)(5)(ii)(D) and 682.410(b)(5)(iv)(B). Paragraph (b)(5)(ii)(D) states that after the guaranty agency (*i.e.* USA Funds) pays a default claim on a loan, but before it reports the default to a consumer reporting agency or assesses collection costs, it shall, within the time period specified in paragraph (b)(6)(ii) (*i.e.* forty-five days), provide the borrower with the opportunity to enter into a repayment agreement on terms agreeable to the agency.

Paragraph (b)(6)(ii) requires that the guaranty agency send a notice to the borrower containing certain information within forty-five days after paying a lender's default claim. Paragraph (b)(5)(iv)(B) states that the deadline established by the guaranty agency for requesting administrative review under paragraph (b)(5)(ii)(C) must allow the borrower sixty days from the date of the notice to request such administrative review.[2] These provisions say nothing about giving a borrower sixty days to enter into a repayment agreement in order to avoid collection costs. It merely states that a guaranty agency cannot impose collection costs until the notice to the borrower has been sent, and the sixty day time period that Ms. Bible keeps referring to is the

---

[1] This language is also consistent with 34 C.F.R. § 682.405(b)(1)(vi) of the HEA regulations, as discussed *infra*.

[2] Ms. Bible does not assert that she requested administrative review, nor does she dispute the validity of her loan.

time period in which she had to request administrative review to dispute the validity of the loan. *See* 34 C.F.R. § 682.410(b)(5)(ii)(C) ("opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation").

As pointed out by USA Funds, the HEA regulations explicitly require guarantors to assess collection charges to defaulting borrowers. 34 C.F.R. § 682.410(b)(2) states:

> Collection charges. Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency *shall* charge a borrower an amount equal to *reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim*. These costs may include, but are not limited to, all attorney's fees, collection agency charges, and court costs.

(emphasis added). Ms. Bible does not address this particular paragraph of the regulation in her brief, except to argue that USA Funds should not be permitted to rely on the language of the HEA while arguing that she may not do so in her breach of contract claim. The imposition of collection costs is clearly and explicitly authorized—and mandated—by the HEA regulations.

The regulation section specifically addressing the loan rehabilitation agreement also contemplates that collection costs will be imposed during the period the borrower is participating in the loan rehabilitation program. 34 C.F.R. § 682.405(b)(1)(vi) states that the guaranty agency must provide the borrower with a written statement informing her of the amount of the collection costs to be added to the unpaid principal at the time the successfully rehabilitated loan is sold to another lender, and that these costs may not exceed 18.5% of the unpaid principal and accrued interest at the time of the sale. Thus, the HEA regulations acknowledge that collection costs will be imposed on borrowers during rehabilitation program, and USA Funds did not act contrary to the HEA in doing so.

Ms. Bible cites to a brief filed in *Educ. Credit Mgmt. Corp. v. Barnes*, 318 B.R. 482 (S.D. Ind. 2004) to support her argument that a borrower may avoid collection costs in their entirety if

16

she enters into a rehabilitation agreement. However, a legal brief is not binding or persuasive authority, and Ms. Bible cites to no other legal authority issued by a court in support of her argument. Additionally, there is nothing in the plain language of HEA or the regulations that prohibits imposition of collection costs once the notice has been sent and a repayment agreement has been entered into.

Ms. Bible also attempts to argue that this District previously stated that delinquent borrowers had the opportunity to avoid the assessment of collection costs by paying or negotiating new terms for the loan, and if no response to the letter informing the borrower of her payment options was received, only then may the delinquency permit the assessment of collection costs. *Barnes*, 318 B.R. at 491 n.9. However, this was not the issue before the court in that bankruptcy action, which was to determine the constitutionality of HEA regulations. The District Court's discussion of what occurs in a "typical delinquency" was in a footnote, and is arguably dicta that cites to no regulations or other legal authority. Based upon the plain language of the HEA, the Court concludes that the HEA does not prohibit the assessment of collection costs in the manner set forth in Ms. Bible's First Amended Complaint, and she has thus failed to state a claim upon which relief may be granted.

Having determined that the HEA does not provide borrowers with a private right of action, the Court concludes that Ms. Bible has not stated a claim against USA Funds. In addition, there is nothing in the terms of the MPN, the Rehabilitation Agreement, or the HEA that prohibits the imposition of collection costs in the manner alleged by Ms. Bible in her First Amended Complaint. Therefore, USA Funds' Motion on Ms. Bible's breach of contract claim is **GRANTED**.

### 3. RICO claim

In her final claim, Ms. Bible asserts that USA Funds committed a RICO violation in association with GRC and Sallie Mae. As previously discussed, this claim is preempted by the HEA, as it merely restates allegations that USA Funds violated the HEA. In addition, this claim is without merit because Ms. Bible cannot show that USA Funds acted unlawfully or fraudulently in the imposition of collection costs or application of her payments to collection costs pursuant to her MPN and Rehabilitation Agreement. Ms. Bible alleges that USA Group committed mail and wire fraud, but she has not shown participation in a scheme to defraud; commission of an act with intent to defraud; or the use of mails or interstate wires in furtherance of a fraudulent scheme. 18 U.S.C. §§ 1341 and 1343. Indeed, Ms. Bible's Complaint and the attached exhibits show that USA Funds did not engage in any racketeering activity, therefore, she has not stated a claim under RICO. Therefore, USA Funds' Motion on this claim is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, USA Funds' Motion to Strike (Dkt. 45) is **DENIED**, and its Motion to Dismiss (Dkt. 47) is **GRANTED**. Ms. Bible's First Amended Complaint is **DISMISSED with prejudice**. Accordingly, the Plaintiff's Motion for Class Certification (Dkt. 4) is **DISMISSED** as moot.

**SO ORDERED.**

Date: 03/14/2014

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Arielle Cohen
NATIONAL CONSUMER LAW CENTER
ariellecohen@nclc.org

Charles M. Delbaum
NATIONAL CONSUMER LAW CENTER
cdelbaum@nclc.org

Curtis P. Zaun
NICHOLS KASTER PLLC
czaun@nka.com

Anna P. Prakash
NICHOLS KASTER, PLLP
aprakash@nka.com

E. Michelle Drake
NICHOLS KASTER, PLLP
drake@nka.com

Joseph C. Hashmall
NICHOLS KASTER, PLLP
jhashmall@nka.com

Amanda C. Couture
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
amanda.couture@ogletreedeakins.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com

Christopher C. Murray
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
christopher.murray@ogletreedeakins.com

Todd J. Kaiser
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
todd.kaiser@odnss.com